Thank you, Your Honor. Thank you, counsel. The case was well argued. We'll take it under advisement. We'll call our last case of the morning, which is United States v. Campbell Malone. May it please the Court, excuse me, I'm Judith L. Bourne, and I'm representing Campbell Rowan Malone, the appellant in this matter. I'd like to start... Would you like to reserve time for rebuttal? Yes, Your Honor. And I'd like to reserve at least three minutes, and any other time that I might not use on the record. All right. Thank you. I'd like to start by speaking about what is the conspiracy or scheme that is involved in counts two through five. The only conspiracy or scheme to which evidence was presented in this case involved corruptly obtaining a contract... Can I interrupt you? Because this is confusion on my part, going through the briefs. I thought the judge said that he was not... Is it Malone? Yes. Mr. Malone was not involved in any conspiracy, or the conspiracy charges were dismissed. Have I got that wrong? No, Your Honor. In fact, I shared your confusion whenever I read the government's brief or the government's argument. I did too. I did too, Your Honor, which is why I wanted to start with trying to clarify what I thought... Well, maybe if I'm right, then you would not need to address me on that. Conspiracy is not an issue in this case, insofar as Malone is concerned. That's my understanding. Okay. Okay. So then we go to the, quote, scheme that is involved in counts two through five. But that scheme, once again, refers to the same entity, which is the conspiracy that's charged in count one. But it still goes to corruptly obtaining the contract with the activity of Eugenio Harris, and the submission of a false claim. Although there is language talking about generally trying to get as much money as possible from the government of the Virgin Islands, there is absolutely no evidence presented that GRM or any of the defendants would not have competently and properly fulfilled the contract if a notice to proceed had been provided. So all of that language about trying to obtain all the money possible really has no meaning in this case. Well, except that, you know, I suppose it's in the eye of the beholder. Now, you've narrowed the issue so far that once you find out you don't have the contract, then all bets are off after that. And I guess that's your theory. My guy came in late, so, you know, how could he possibly be part of this? He could not have been part of that conspiracy or scheme. That is true. Especially since with regard to, they tried to bring the submission of the claim into the same conspiracy. But clearly there was no idea of submitting such a claim until January of 2003 when the contract was terminated for the convenience of the government because that is the only basis for the claim and it's so stated on the claim. So that's exactly my point that at the time that... Couldn't we have a second scheme here? The scheme to defraud after the fact by submitting the double bill false claim. Oh, okay. I was going... You're going to the claim? Yes, that could be. But I was first trying to deal with the wire fraud cases. And the only possible scheme that that could fit into if it was in fact a crime would have been perhaps a scheme if they could prove that Mr. Malone actually willfully made a false statement that there was a scheme to defraud the unnamed, unidentified bonding company. But there was no such charge. Mr. Malone doesn't dispute that he made misrepresentations. Yes, he does. He agrees that he made in the two documents that he actually reviewed and he states what a review is. There were three separate projects that GSM was involved in that he stated, but these were misrepresentations. They were misrepresentations made to him. Well, but he knew that they were misrepresentations. No, he admitted it was a wish list. Right? Yes. In other words, there was no hospital that had been contracted for GSM to work on. The work was not in progress. Well, first of all, he never testified. I thought your brief conceded that though. Conceded which? That there were misrepresentations. There were misrepresentations, but not necessarily what I'm saying. There may not have been his misrepresentations. The misrepresentations were made to him. He had asked, he stated that he asked if there were written contracts and the agent said that Mr. Malone had said that he was told that there were written contracts. He had asked to receive them. They said they were going to be sent to him. He sent off the application because all of this was done within, I think, one or two days, but then he never received the contracts. Also, when he was being asked these questions about, well, was this so and was this not so, he was answering these questions a year later, and it is not at all clear. If he's stating that he now understands that no, none of this was true, but not necessarily that he knew it at the time. You told a government agent, I think it was the FBI, that GSM was not involved in litigation, but he knew that GSM was involved in litigation. Isn't that a misrepresentation? Yes, and he stated, in fact, that when it was pointed out to him, he seemed puzzled. He said he doesn't know why he would have done that because he said he would never have made such a misrepresentation. But these were statements that he included in a document that was going to be used to fund, in order for GSM to get, apparently, a lucrative sewerage contract with the Virgin Islands. Financial statement. It was a statement that was included in a part of the application, which he was not providing, which he was not, which was basically the statement of Mr. Andrews. It was not his statement. But we do have facts here of him having attended a meeting and then going out and coming back with cash and giving cash to people along with Mr. Andrews. I mean, we have some evidence of some involvement. We have a check payable to him, written by him in the record. I mean, it's not, we have some things that show that this may not have been an isolated situation where he is just the transmitter of information, kind of with blinders on. Do you acknowledge that? There is this other evidence. No, no. First of all, the meeting that was referred to is a meeting at which he was not present. Apparently, he was there, and in fact, that is the subject of another suit that's being brought against him. He was... But the jury has to try to figure out, does this guy know what was going on or not? Right? They have to figure out, did he know what was going on? Yes. So they have to figure it out from something. And this evidence of his accompanying Mr. Andrews and coming back with cash and having written checks, doesn't this show some involvement? Your Honor, these checks have nothing to do with this case. Those checks are, in fact, a portion of a totally separate case which the government has brought. I didn't know what they had to do with, but there was reference in the record, and I was trying to figure it out. That has nothing to do... That's exactly what... But there is a meeting. He did go up with Andrews and come back, and Andrews had cash. There were several meetings, apparently, in Tortola, one of which had to do with the sewer contract, one of which had to do with something totally different. He was actually there for the other meeting. All right. How is a jury supposed to figure out that this man really had nothing to do with the situation? He just was a poor victim of circumstance when he did this bond application. Your Honor, the judge, with respect to the matter... Because he got a heavy burden to overturn the jury verdict. He got a heavy burden here. With respect to the portion that you've referred to, the judge clearly figured it out when this particular scheme until, basically, the sending of the bond application. The bond application, however, was a representation of Mr. Andrews with one exception. Two exceptions, actually. That exception is the financial statements of the corporation. With respect to that, he states in the letter, transmitting it, that, well, first of all, Mr. Wayne Price said he was supposed to do what's called a review. Did Mr. Malone sign the documents that contain all of this information? Well, the document that was in support, the financial statement that was in support of the bond application. Yes. The financial statement, yes. Did he email those or fax those over wire lines? Yes. Okay. He stated in that, as a part of that, that his reviews that consist principally of inquiries of company personnel and analytical procedures applied to financial data, it is substantially less in scope than an examination in accordance with generally accepted auditing standards, the objective of which is the expression of an opinion regarding the financial statements as a whole. Accordingly, we do not express such an opinion. He testified in this case? Excuse me? Did he testify? No, this is the documents. No, no. Did Malone testify before the jury? Not in this trial. Apparently, he did testify in the first trial. I'm sorry, just one last question about the checks. Did he not write a check for $2,500 to a Mr. Harris? Wasn't Mr. Harris paid $2,500? That's cash. Yes. All right. Did that come from Mr. Malone? Did not come from Mr. Malone. I'm sorry. From Mr. Malone. It came through a bank account, which he had, I believe the evidence was that Mr. Andrews, who was a longtime friend of his, had asked him to put this money into his account and told him to write the checks to him. Told him, meaning Mr. Malone? Excuse me, yes. He told Mr. Malone. Okay, sorry. Just trying to straighten out the record. Could you get to the false claims aspect? There's clearly double entries here. I'm assuming that the false claim itself is not, I'm not sure whether the claim itself is challenged as being false, where there weren't double billings, but there are double billings here. Why is this not problematic in terms of his intent to defraud the government of money? Your Honor, there are double billings which were set forth in the joint supplemental appendix, and I'd like to go through them. The first one is on— All right, your time is up. We're going to take it off rebuttal. We'll give you another two minutes on this aspect and give you three, four minutes of rebuttal. With respect to the double billings, the only items which are actually double billed, that are clearly double billed, amount to $11,150 of a total claim of $713,911.95, and $8,750 of that $11,000 is the first one, which was clearly a mistake because you have two entries which were exactly the same, one under the other. It was not something that was hidden. As to a number of these others, and I can go through them exhaustively, they are not necessarily double billings, except in one other case, which is probably $2,400, and given the number of misspellings, the number of typographical errors in these documents, some of them, because of the differences in the number of hours claimed and in the descriptions of what they actually cover, of which the government claims is a double billing, some of them is probably simply a typographical error as to a date. But the jury didn't buy that. How can we overturn the jury's verdict? Because of the arguments that were made by the government. The government, even though the trial judge found in his Rule 29 motion that there was no reason to believe that Mr. Malone was aware of the corruption of Eugenio Harris, and therefore nothing that was attributed, that Mr. Andrews did prior to, at best, the filing of the bond application could be attributable to him, the government spent most of its time conflating Mr. Malone with Mr. Andrews' statements, with Mr. Andrews' knowledge, with Mr. Andrews' activities, which had occurred long before any action by Mr. Malone. So it was not something that he was involved in. It should not have been attributable to him legally under Lopez. It could not be attributed to him, yet almost 70% of the government's argument was simply conflating Mr. Malone with everything that he said. The false claim was for, if I remember correctly, $750,000, is that correct? Yes. Your contention is that the GSM is entitled to $750,000 less $11,000? Oh, I'm not contending the GSM is necessarily entitled to anything but that. All right, that Malone submitted a claim for $750,000. Well, no, he did not submit the claim. He prepared the... He put together the information provided to him and gave it to GRM. He signed it. Excuse me? He signed it. No. He signed his name to it, didn't he? No, not to the claim. On behalf of the GRM president. I don't believe he signed the claim. He signed the bonding as an attorney-in-fact. All right, but he's... I don't believe he signed the claim. He was the accountant and did all the paperwork for GSM to make its claim. What he stated... GRM, I'm sorry. The testimony was that he had said that he got the information and compiled it into a claim. And you see the claim is divided into sections and there are explanations of what was being done, et cetera, et cetera. The claim itself was... The cover letter was signed by Mr. Andrews. I believe the claim was actually signed by Mr. Andrews. Said clearly that this was something to negotiate, et cetera, et cetera. All right, we'll hear from you on rebuttal. Thank you. We'll give you three minutes at rebuttal. Good afternoon, Your Honors. My name is Paul Murphy. I'm an Assistant United States Attorney for the District of the Virgin Islands, and I represent the United States and the government of the Virgin Islands in this case. The first point I would make to the court is this. The government dismissed Mr. Malone from Count One after the court granted a Rule 29. Now, if the court had granted a Rule 29 as to the entire Count One, why in the world would the government file the motion to dismiss? It's because the court didn't grant a complete Rule 29 as to Count One. Count One charged a conspiracy to violate 666 in two different ways and to commit mail fraud, and the court made a decision that the government had not proved that Mr. Malone had knowledge of the corrupt aspects of the relationship with Mr. Eugenio Harris. It left the mail fraud count intact, but then the court said something to the effect of this to the government. Mr. Murphy, are you going to pursue the mail fraud conspiracy? And I said yes, and he said, well, that's a bit like throwing mud or some other substance on the wall and seeing what sticks. That gave me pause to consider what I should do, so we dismissed the mail fraud as to Mr. Malone because the judge thought it created unanimity problems. That did not mean that the court found that there wasn't sufficient evidence for a conspiracy with regard to Mr. Malone on the mail fraud counts, and I think that's a critical point. Was it judgment of conviction? Does it reflect conspiracy for any offense on the part of Mr. Malone? No, it did not. He was not charged with a conspiracy. However, we have aiding and abetting in there, and the fact that we, the government, decided— Well, I'm sorry. Let me just finish. The point is we're not really considering on appeal conspiracy on the part of Malone. No, but the Pinkerton Doctrine, which applies to a conspiracy, whether it's charged in an indictment or not, equally applies to a substance of offense if a conspiracy was established. The court concluded at the Rule 29 that the government had satisfied that burden. It let that go forward. I interrupted your response at Justice Garrison. I'm sorry, Judge. I said, but you did charge aiding and abetting. I did, but aiding and abetting actually, of course, is a theory of proof, as well as is the Leahy case in the Third Circuit or Pinkerton. Pinkerton is for conspiracies. Leahy in the Third Circuit discusses but really doesn't decide the scope of vicarious liability. It indicates in that case that perhaps it's limited to those events that take place once the person joins the scheme. Let me, if I can, go back first. Can I ask you a general question? Yes, sir. What evidence is there that the defendant knew the claim that we were talking about was fraudulent? Your Honor, I think in looking at the evidence of his knowledge with regard to the claim, you have to start with his evidence of knowledge and falsity of the bond application because when he comes to the claim and begins to prepare the claim, he is not an ignorant person coming to this from the outside. He's a person who participated in creating the bond application. As the court pointed out, he falsified the fact that the $350,000 was the subject of a lawsuit. He said there was no lawsuit, but more importantly, he listed it as an asset of the corporation, knowing it was subject to a lawsuit. It wasn't really money. That's number one. Number two, if you take a look at the listing of contracts that are in the bond application that he signed as attorney-in-fact on behalf of the President, the first one is a $1.5 million professional services contract, and there is in the record a document that came from his computer that shows that just 17 days before that, he knew, according to that document, that Mr. Andrews was trying to get that contract, and if the court looks at the claim submissions that were put in in the joint supplemental appendix, you'll find an entry in there from December 27th where there's a charge for Andrews still trying to get that professional service contract. So he knows. Is the false claim a problem because of the double billings alone? No, it is not, and this goes actually to the last argument or the last issue that's raised by the appellant. The appellant argues that the government couldn't argue vicarious liability. The court instructed that vicarious liability did apply. Additionally, you had the conspiracy count that permitted the government to argue under Pinkerton that there was vicarious liability. You have the Leahy case in the Third Circuit, which allows for vicarious liability for co-schemers, and you have the aiding and abetting theory. So there was nothing wrong with the government's argument on that ground, and once you take that and accept that as a proposition, the evidence that showed that Mr. Andrews knew that the items that were going into that claim, any number of them, including, for example, charging $300 an hour to wait to see the governor, once he knew that those were false, that is attributable to the defendant. So the falsity, I mean, there's some argument about how he wasn't entitled to file a claim like this. It wasn't allowed under the contract, but the claim itself says, you know, as a matter of equity, the fact that they made a nice try, if you will, to get this money shouldn't be seen as a false claim. You're saying that the various aspects of even the single billings are false? Yes, Your Honor. And were shown to be false at trial? Yes, Your Honor. In fact, actually, I think it was pointed out that that's conceded by the appellant in that there's a concession that there were false representations. And if you go through the government's closing argument, those are the representations the appellant is attacking. It doesn't really attack any of them as being false. And let me go back to the court's question with regard to the contract. There was no contract here. There was no contract. And that was very, very clear. Nevertheless, the claim, for example, says we're submitting it under the contract. Well, but that's a nice try. Well, Your Honor, you don't get— You know, if there isn't a contract, you still send it in saying, gee, I hope they pay this. Well, actually, I don't think with a government agency you do that. I think you have here a situation where quite clearly they know there's no contract. They know there was no bond. They know that there was no notice to proceed. They know all of those things. And this quantum error theory is something they just made up. It's a nice theory, but it didn't just— It's false claim, the fact that they're probably not entitled to it. Yet they submit it. It's false? Unless the information provided in it is false. Well, the information provided in it is false. But in this particular case, when you look at the facts and the way this was proceeding, all they were trying to do was get money out of the government of the Virgin Islands. Well, if there was some information that they gave the government, such as proposals, statements, documents, construction plans, whatever they gave the government, don't they have proprietary interest in those documents? They claim that information was not returned to them, and they also claim that the information would be used by a subsequent contractor. Well, that's very speculative. Well, it may be speculative, but it's a claim. It's a lawsuit. Your Honor, they have to file a lawsuit or ask the government not to do it. But the fact of the matter is, it would be a bit like the government having to pay any contractor who wants to get a contract from the government for all the preparation work they did, and there's no contract. No, but the government doesn't have to do it. The government can laugh when they submit this 30-page document saying, please, on quantum merit, on equity, please pay us. It doesn't make the claim false. It makes the claim kind of ridiculous, useless, and frivolous. It doesn't mean it's false. It's false under the contracting provisions of the Virgin Islands, Your Honor. You've got to have a contract with the government of the Virgin Islands to get anything. And the fact of the matter is, that would be like somebody going around the Virgin Islands surveying all of the wrecked cars and going to the government of the Virgin Islands and saying, you know what, I've surveyed all the cars for you. I'll go pick them up. No, we don't want you to do that. Well, here's your bill for the work I did. But if they did actually survey the cars and spent the time, and if the claim includes the reasonable value of their services, I have difficulty saying that that's necessarily a false claim. It's probably going to be treated as a frivolous claim when delivered and not paid on. But there's nothing in there that's false. The entitlement doesn't exist, but does that make it a false claim? Well, I do, and I think we can go on, Your Honor. But the fact of the matter is the content was false. Part of the content that the defendant put in was knowingly false. What was false about the content? Well, the double billings, for example. How much was double billed? I imagine the government has reported. I think it's been accurately reflected. It's not that much money in terms of the exact amount, but that's not the point. The point is there were double billings in there which should have put him on notice, and there was a willful blindness instruction in this case. It should have put him on notice, particularly that one that is so clear. I mean it's right on the page. It's back to back. Do you know the amount of the double billing? I do not. I didn't add them up. But the point is that it put him on notice, and willful blindness was very, very clear throughout this case. The court instructed on it, and the government argued it, and it was appropriate for the jury to decide. Based on his conduct in doing the bond application and putting in, for example, a people's hospital, that's one of the ones listed. The evidence was that came from a contract that IBS, one of Mr. Malone's companies, was seeking in Tortola. It wasn't even a GRM project to try and get. It was an IBS project. And he told the agent that there was no contract on that. He told the agent that there was no contract for the professional services. With regard to the other two contracts in there, he said he didn't see the contracts. But he's on notice that he's putting things down in that bond application that are false. Then he gets to the claim, and having joined Mr. Andrews in trying— and by the way, the GVI is being defrauded here. They have a right to a contracting process, which this defendant, contrary to his claims, actually entered into with Mr. Andrews because it's very clear from his memo to Fernstein that he knew that it was necessary to get that bond to get the contract. The claim in the appellant's brief that they'd already obtained the contract is not correct. That is inaccurate. And so when he comes to that claim, he is way into this process in terms of his knowledge that they are doing things in this scheme to get the contract, which is property, to get money out of the government of the Virgin Islands by getting the contract for a company that is not really bondable. That's a fraud. And you're saying there was evidence at trial that with respect to the claim that even some of the single billings were overblown or improper? Absolutely, Your Honor. Number one, the defendant really didn't challenge those and raise that issue on appeal. For example, Mr. Andrews charged $300 an hour to sit and wait for public officials like the governor of the Virgin Islands. That was part of his claim? That was part of his claim. Yes, Your Honor. Was the jury given the dollar figures, the amount that was being sought in the false claim charge? They were. Was it $750,000? Is that correct? It was $730,000, $740,000. They got the false claim. Wasn't that admitted? They did. They got the entire claim. They got to look at it. They heard all the witnesses testify. There was evidence that Mr. Andrews was charging for meetings that never took place. Your time is running. I want to ask you a question about the sentence. He's convicted and sentenced on three different claims. Is that right? Wire fraud, the false claim, and the scheme to defraud? Well, counts two through five for wire fraud and counts seven for the false claim. Were they consecutive or concurrent sentences? No, they were not. They were concurrent? Yes. The only claim that's raised— So he got four years on all three? I'm sorry? He received a four-year sentence on all three? Yes, sir. That was run concurrent? Yes, sir. Okay. The only claim that was raised on appeal in the opening brief, there was a new claim raised in the reply brief. I think the court should disregard because, A, it wasn't raised in the opening brief, and, B, it wasn't in the record in any way. But with regard to the opening brief, the claim was that there wasn't sufficient evidence to justify the court imposing a fine. Of course, that turns the rule on its head. The rule is that the appellant has to establish that he doesn't now or in the future have a chance to pay. I do have to ask you one other question. Your claim that Malone knew in the false claims charge that the figures that he was putting together, his knowledge is imputed from knowledge that Andrews had? Is that— In part. In part. In part, yes, sir. So Malone knew a little bit, had some knowledge that what he was compiling was false, but the information that Andrews had, whatever it was, can be imputed to Malone? His acts can be imputed, and he is giving false information to Malone. And the reason I say that, Your Honor, is both—is Pinkerton, Leahy, and Aiding and Abetting. Because once Mr. Malone joined the scheme to defraud, which definitely occurred not later than when he starts to do the bond application, at that point, he is in this, and he's in it with Andrews. Was the jury so instructed? Well, the court didn't make a fact finding, no. You mean as to Pinkerton, Leahy? Yes, as to imputing Andrews' knowledge to Malone. There was a co-schemer instruction, and I can tell you where it is if you'd like. Please. Co-schemer responsibility was in September 18, 2006, instruction at page 71. And if I may also, with regard to that, I would point out that Leahy, which is the co-schemer—may I finish? Yes. The co-schemer case actually leaves open the issue about whether or not prior acts of a co-schemer can be attributed to Mr. Malone. But I would urge the court to read my closing argument. I don't believe anything was attributed to Mr. Malone with regard to Mr. Andrews' conduct, except those things that actually occurred with regard to filing the claim and making the bond application. Thank you, Your Honor. Thank you. Ms. Borner, give me a brief comment. Thank you, Your Honor. With regard to the fine at sentencing, the trial judge stated that he would ask the Office of Probation and Parole to provide an analysis of the information which was provided by the appellant with respect to his ability to pay a fine. And yet, the fine was imposed at that sentencing hearing without this analysis, and there's no indication that such an analysis was ever made. So there was information that was provided that was not taken into account. The People's Hospital contract, the only evidence was that it was started out as an IBS contract, or that IBS was formed to get it. There is no evidence that at the time that the bonding application was being made that it was not, in fact, a GRM contract. His understanding was that it was a done deal. The government, of course, wanted to say it was corrupt, but there is no evidence that it was, in fact, in violation of any British Virgin Islands law, and that's where the contract was. With regard to 2 through 5, the government charged Mr. Malone with violations of the Wirefart Act because Wayne Price sent him information, sent him the documents which needed to be filled out for a bonding application to be made. The only action that Mr. Malone took with regard to that was the action in Count 5, which was to send the document back. But even there, I believe that reading, and I believe I've said it out in the briefs more clearly, that there is no actual evidence that at the time this bonding application was sent in that Mr. Malone knew, definitely knew, that there were false allegations in there. With respect to most of the allegations that the government relies on, he states that he had asked, he had made his inquiry, he had been told, yes, this is the case, and he sent it in. He expected to get the documentation confirming it, but it never got to him. And that subsequently, he recognized that they were false. With respect to the, as I said, the one that he stated a year later that, yes, that's clearly wrong, he also says that he doesn't know why he would have said that. So clearly, he seems to be saying, this has to be some kind of mistake, because I would never have made such a misrepresentation. This was in the interview with the government agents. So it's not as if he was saying, oh, well, I did this because of this or that. He said he doesn't understand at this point his recall why he did that, because it does appear to be incorrect. The claim itself has, as I said, so first of all, there's so many. We'll give you just 30 seconds to wrap up, please. Well, if the government agrees that my figures are correct, then he has to agree that of all of those that they cite as double billings, the only ones which actually are the ones that are on the same page, and one which appears to be the same meeting because of the dates and who were involved, but the descriptions are totally different. So that someone actually going through it would not notice necessarily that it is the same meeting, because the descriptions are totally different. Thank you very much. Counsel, the case is well argued. We'll take it under advisement. I ask the clerk to recess the court.